LEARY v. MAYOR AND ALDERMEN OF JERSEY CITY et al.

(Circuit Court, D. New Jersey. May 3, 1911.)

No. 1.

1. TAXATION (§ 179*)—NAVIGABLE WATERS—GRANTS OF LAND UNDER WATER.

An instrument executed by the riparian commission of New Jersey pursuant to 3 Gen. St. N. J. 1895, p. 2787 et seq., empowering the commission to execute a lease in perpetuity for an annual rental, which bargains, sells, leases, and conveys to the grantee, a corporation, and its successors and assigns forever, a tract for which conveyance has been sought by the grantee, with the right and franchise to exclude the tide water from so much of the tract described as lies under tide water, and which declares that the grantee shall take, hold and enjoy the premises subject to the payment of an annual rent, and which contains a covenant

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

by the grantee on behalf of itself and its successors and assigns for the payment of the rent, and which authorizes the state on nonpayment of any installment of rent to re-enter, is a grant in fee with a condition subsequent that, if the annual payments are not made when due, the estate may be defeated, so that the land described is taxable in the hands of the grantee or one claiming under him.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 302; Dec. Dig. § 179.*]

**2.** NAVIGABLE WATERS (§ 37*) — GRANT TO MUNICIPALITY — "HARBOR" — "SHORE."

A statute incorporating a township and fixing its boundaries as "on the southeast by New York Harbor," etc., fixes the boundaries of the township so as to include lands under the water of the harbor to the boundary line of the state, since a harbor is a recess in the coast line of a body of water in which ships can be sheltered, and it may extend to a line inside of which vessels may find protection, and the word has a more extended meaning than "shore," which when applied to a tide water bay usually means the part between ordinary high and low water marks.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227, 285; Dec. Dig. § 37.*

For other definitions, see Words and Phrases, vol. 4, pp. 3213–3215; vol. 7, pp. 6495–6497.]

**3.** NAVIGABLE WATERS (§ 37*)—GRANT TO MUNICIPALITY—BOUNDARIES—LEGISLATIVE INTENT.

The legislative intent in the use of words of a statute creating a municipal corporation and defining a water boundary will govern rather than the literal meaning of the words used, and the words are not subject to the strict rule of construction applied when the state grants title to some of its territory to a private grantee, but the legislative purpose sought by the territorial subdivision must be kept in view.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227, 285; Dec. Dig. § 37.*]

**4.** BOUNDARIES (§ 14*)—GRANTS—NONTIDAL STREAMS—"TO"—"ON"—"BY"—"AT"—"ALONG."

In a conveyance the words "to," "on," "by," "at," "along," a nontidal stream presumptively carry title as far into the stream as the grantor possesses.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 102–107; Dec. Dig. § 14.*

For other definitions, see Words and Phrases, vol. 1, pp. 351–356, 593–599, 929–932; vol. 8, p. 7585; vol. 6, pp. 4960–4966, 7737; vol. 8, pp. 6984–6986, 7816–7817.]

**5.** NAVIGABLE WATERS (§ 37*)—TIDAL WATERS—BOUNDARIES.

Any boundary at tide water established in a grant of land includes the land below the high-water mark, as far as the grantor owns.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227, 285; Dec. Dig. § 37.*]

**6.** NAVIGABLE WATERS (§ 37*)—GRANTS—CONSTRUCTION.

The presumption that a grant of land bounded on or along streams above tide water carries the exclusive title to the grantee to the center of the stream, unless the grant clearly denote a contrary intention, does not exist where the grantor is the state, unless the intention to so convey is clear.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227, 285; Dec. Dig. § 37.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**7.** TAXATION (§ 176*)—PROPERTY SUBJECT TO—STATUTES.

Lands under water of a harbor which is fixed as the boundary of an incorporated township incorporated by statute defining its boundaries as "on the southeast by  *   *   *   harbor" are within the limits of the municipality, and taxable as such.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 305; Dec. Dig. § 176.*]

**8.** TAXATION (§ 529*)—PAYMENT—PRESUMPTIONS.

The presumption created by lapse of time that taxes have been paid so that a lien for the taxes has expired is one of fact, and is rebuttable.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 982–984; Dec. Dig. § 529.*]

**9.** TAXATION (§ 529*)—PAYMENT—EVIDENCE—PRESUMPTION FROM LAPSE OF TIME—FINDINGS OF COMMISSIONERS—CONCLUSIVENESS.

A finding of the commissioners of adjustment under the New Jersey tax adjustment act of March 30, 1886 (P. L. p. 149), that taxes are due and unpaid, cannot be overcome in a suit to restrain the sale of land for the unpaid taxes by a presumption of payment created by lapse of time.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 982–984; Dec. Dig. § 529.*]

**10.** MUNICIPAL CORPORATIONS (§ 979*) — TAXATION — COLLECTION — INTERFERENCE BY INJUNCTION.

Interference by injunction with collection of taxes legally imposed by a municipal corporation on the ground of laches will be accorded only where complainant's right is clear, the injury imminent, and the remedy at law inadequate for his protection.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2120–2123; Dec. Dig. § 979.*]

In Equity. Suit by Daniel J. Leary against the Mayor and Aldermen of Jersey City and others to restrain the sale of lands for unpaid taxes. Heard on bill, supplemental bill, answers, stipulations, and proof. Bill dismissed.

Ziegener & Lane, for complainant.
Warren Dixon, for defendants.

RELLSTAB, District Judge. The complainant is the assignee of a certain written instrument made by the state of New Jersey on April 30, 1881, to the Morris & Cummings Dredging Company. This instrument conveyed an interest in certain lands under the waters of the bay of New York in Jersey City. The assignment is dated February 24, 1904. Taxes have been assessed against these lands for the years 1883 to 1905, inclusive, aggregating the sum of $163,392.24; which taxes have not been paid. On April 19, 1906, the city collector of Jersey City gave notice that pursuant to a resolution of the board of finance of Jersey City, passed March 23, 1906, and section 13 of the act entitled "An act concerning the settlement and collection of arrearages of unpaid taxes, assessments and water rates or water rents in cities of this state and imposing and levying a tax, assessment and lien in lieu and instead of such arrearages and to enforce the payment thereof, and to provide for the sale of lands subjected to future taxation and assessment," approved March 30, 1886, known as the "Martin Act" (Act March 30, 1886 [P. L. p. 149]), he would

on May 29, 1906, sell such lands for the payment of the taxes assessed for 1883 to 1902, inclusive. No sale was had on this date, but on July 3, 1906, the city collector advertised in a public newspaper that such sale would take place on July 24, 1906. Thereupon, on July 9, 1906, the original bill was filed to restrain such sale, etc. Some time after the filing of such bill (the precise time does not appear) the board of aldermen of Jersey City, with the concurrence of the board of finance, caused a commission to be appointed under the said Martin act. This commission made an adjustment of such taxes, which action, however, was not confirmed by the judge of the circuit court of Hudson County, to whom it was reported, the report being referred back to said commission for further consideration. Subsequently the commission made another report concerning inter alia the lands in question, which was confirmed by the circuit judge. Thereupon the supplemental bill in this cause was filed; such further adjustment and the confirmation being made the basis of the said bill.

The complainant contends that the taxes are illegal because, first, the lands belong to the state of New Jersey, and are not taxable; second, the lands are without the jurisdiction of the state of New Jersey; third, the lands are not within the taxing district of Jersey City; and, fourth, the assessment was made upon real estate, and not upon the interest of the complainant therein. He also contends that the lien of the taxes has expired.

[1] First, as to the ownership of the land taxed. This involves the legal effect of the conveyance made by the state to the complainant's assignor. The legislation relating to the state land under tide waters, as well as its conveyance, must be considered. The pertinent parts of such legislation are as follows: Section 4 of the supplement to the act entitled "An act to ascertain the rights of the state and of the riparian owners in the lands lying under the waters of the bay of New York and elsewhere in the state," approved April 11, 1864, which supplement was approved March 31, 1869 (3 Gen. St. N. J. 1895, p. 2787):

"That in case any person or corporation who by any legislative act, is a grantee or licensee, or has such power or authority, or any of his, her or their representatives or assigns shall desire a paper capable of being acknowledged and recorded, made by and in the name of the state of New Jersey, conveying the land in the proviso to the third section mentioned whether under water now or not, and the benefit of an express covenant, that the state will not make or give any grant or license power, or authority affecting lands under water in front of said lands, then and in either of such cases, such person or corporation, grantee or licensee, having such grant and license, power or authority, his, her or their representatives or assigns, on producing a duly-certified copy of such legislative act to said commissioners, and in case of a representative or assignee also satisfactory evidence of his, her or their being such representative or assignee, and requesting such grant and benefits as in this section mentioned, shall be entitled to said paper so capable of being acknowledged and recorded, and granting the title and benefits aforesaid, on payment of the consideration hereinafter mentioned; and the said commissioners or any two of them, with the Governor and Attorney General for the time being, to be shown by the Governor signing the grant, and the Attorney General attesting it, shall and may execute and deliver and acknowledge in the name and on behalf of the state, a lease in perpetuity to

such grantee or licensee or corporation having such grant, license, power or authority. and to the heirs and assigns of such grantee or licensee, or to the successors and assigns of such corporation, upon his. her or their securing to be paid to the state an annual rental. of three dollars for each and every lineal foot measuring on the bulkhead line, or a conveyance to such grantee or licensee or corporation having such grant. license, power or authority, and to the heirs and assigns of such grantee or licensee, or to the successors and assigns of such corporation in fee, upon his, her or their paying to the state fifty dollars for each and every lineal foot, measuring on the bulkhead line. in front of the land included in said conveyance; provided that no corporation to whom any such grant. license, power or authority was given by legislative act as aforesaid, in which provision was made for the payment of money to the Treasurer of the state for each and every foot of the shore embraced and contained in the act. nor the assigns of such corporation shall be entitled to the benefits of this section; and provided further, that the said commissioners shall in no case grant lands under water beyond the exterior lines hereby established. or that may be hereafter established, but the said conveyance shall be construed to extend to any bulkhead or pier line further out on said river and bay that may hereafter be established by legislative authority; in case any person or corporation taking a lease under this section. shall desire afterwards a conveyance of all or any part of the land so leased, the same shall be made upon the payment of the said sum of fifty dollars for every such lineal foot, as aforesaid, of the land so desired to be conveyed, the conveyance or lease of the commissioners under this or any other section of this act, shall not merely pass the title to the land therein described, but the right of the grantee or licensee. individual or corporation. his. her or their heirs and assigns, to exclude to the exterior bulkhead line, the tide water by filling in or otherwise improving the same. and to appropriate the land to exclusive private uses, and so far as the upland from time to time made shall adjoin the navigable water, the said conveyance or lease shall vest in the grantee or licensee, individual or corporation, and their heirs and assigns, the rights to the perquisites of wharfage, and other like profits, tolls and charges."

And section 8 of the same supplement (Id. p. 2788):

"That if any person or persons, corporation or corporations, or associations, shall desire to obtain a grant for lands under water which have not been improved, and are not authorized to be improved, under any grant or license protected by the provisions of this act, it shall be lawful for any two of the said commissioners concurring, together with the Governor and Attorney General of the state, upon application to them. to designate what lands under water for which a grant is desired lie within the exterior lines, and to fix such price, reasonable compensation, or annual rentals for so much of said lands as lie below high-water mark, as are to be included in the grant or lease for which such application shall be made. and to certify the boundaries and the price, compensation or annual rentals to be paid for the same, under their hands, which shall be filed in the office of the Secretary of State; and upon the payment of such price or compensation or annual rentals, or securing the same to be paid to the Treasurer of this state, by such applicant, it shall be lawful for such applicant to apply to the commissioners for a conveyance, assuring to the grantee, his or her heirs and assigns, if to an individual. or to its successors and assigns, if to a corporation. the land under water so described in said certificate; and the said commissioners shall, in the name of the state, and under the great seal of the state, grant the said lands in manner last aforesaid, and said conveyance shall be subscribed by the Governor, and attested by the Attorney General and Secretary of State, and shall be prepared under the direction of the Attorney General, to whom the grantee shall pay the expense of such preparation, and upon the delivery of such conveyance, the grantee may reclaim, improve and appropriate to his or their own use, the lands contained and described in the said certificate; subject, however, to the regulations and provisions of the first and second sections of this act. and such lands shall thereupon vest in said

applicant; provided, that no grant or license shall be granted to any other than a riparian proprietor, until six calendar months after the riparian proprietors shall have been personally notified in writing by the applicant for such grant or license, and shall have neglected to apply for the grant or license, and neglected to pay, or secure to be paid, the price that said commission shall have fixed; the notice in the case of a minor shall be given to the guardian, and in case of a corporation to any officer doing the duties incumbent upon president, secretary, treasurer or director, and in case of a nonresident, the notice may be by publication for four weeks successively in a daily newspaper published in Hudson county, and in a daily newspaper published in New York City."

Section 1 of another supplement, approved March 27, 1874 (Id. p. 2791):

"That from and after the passage of this act it shall be lawful, for the riparian commissioners, or any three of them therein concurring, together with the Governor of this state, to fix and determine, within the limits prescribed by law, the price or purchase money, or annual rental to be paid by any applicant for so much of lands below high-water mark, or lands formerly under tide water belonging to this state as may be described in any application therefor duly made according to law; and the said commissioners, or any three of them therein acting and concurring, with the approval of the Governor, shall in the name and under the great seal of the state, grant or lease said lands to such applicant accordingly; and all such conveyances or leases shall be prepared by the said commissioners or their agents at the cost and expense of the grantee or lessee therein, and shall be subscribed by the Governor, and at least three of said commissioners, and attested by the Secretary of State."

Section 1 of the "Joint resolution relative to the riparian commission," approved March 17, 1870 (Id. p. 2796):

"That the riparian commissioners may and shall, in all leases, as well those authorized by the eighth section as those authorized by the fourth section of the act of last year, relating to the subject of lands under water, covenant on behalf of the state that the state will at any time accept the capital sum of which the annual payment is the interest, at the rate of seven per centum per annum, in lieu of all further annual payments, and make conveyance of the fee simple and may convey or lease to any exterior line hereafter to be fixed; and such lease or conveyance under said eighth section and this resolution shall, in all respects, be as effectual to pass all the perquisites of wharfage and other like profits, tolls and charges, as conveyances and leases under the fourth section would be."

Section 1 of the act entitled "An act relative to the riparian commission," approved April 6, 1871 (Id. p. 2796):

"Whereas, applications are frequently made to said commission for grants and leases of lands which were heretofore, but are not now, under tide-water, and it is desirable to quiet the possession of those who so apply, but doubts have arisen whether such cases are now provided for by law; and it has been found by experience that grants and leases containing the grants and covenants authorized by the fourth section of the act approved March thirty-first, one thousand eight hundred and sixty-nine, entitled 'Supplement to an act entitled "An act to ascertain the rights of the state, and of riparian owners, in the lands lying under waters of the bay of New York, and elsewhere in the state,"' approved April eleventh, one thousand eight hundred and sixty-four, and the joint resolution of one thousand eight hundred and seventy, are more readily accepted, and are more satisfactory, than those which do not contain the same.

"Section 1. That the said commissioners with the concurrence of the Governor and Attorney General, in all cases of application for grants or leases

of land now, or at the time of the application, or at the time of the lease or grant, under tide water; and in all cases of application for grants or leases of lands which are not now, or shall not at the time of the application, or at the time of the lease or grant be under tide water, and in all cases of applications for leases or grants for all or any of such lands may, notwithstanding the first proviso of the fourth section of said supplement, or any other clause or matter in said supplement contained, grant or lease, or lease first with a covenant to grant, and grant afterwards, for such principal sum that the interest thereof at seven per centum will produce the rental, such lands, or any part thereof lying between what was, at any time heretofore, the original high-water line and the exterior lines established or to be established, and grant or lease in all cases in which, in their discretion, they shall think such grant or lease should be made, such rights, privileges and franchises as they are authorized to grant in cases coming directly within the said fourth section, and enter into the same covenants in the name of the state, in all cases of grants or leases where they deem such covenants proper, as are authorized in grants or leases under said fourth section, and insert such other covenants, clauses and conditions in said grants or leases as they shall think proper to require from the grantee or lessee, or ought to be made by the state: provided, that nothing herein contained shall authorize grants or leases in front of a riparian owner to any other than such riparian owner, except upon the proceedings and conditions in said supplement provided; and provided also, that the applications for grants or leases, and the certificates of said commissioners, Governor and Attorney General, may in the cases hereby provided for, vary from the provisions of the said supplement in such manner as to conform to this act, and any party who has already asked for or accepted a lease or conveyance may apply for and have the benefits of this act, notwithstanding such former application or former acceptance of a lease or conveyance."

The instrument of April 30, 1881, recites that the Morris & Cummings Dredging Company, pursuant to the act of March 31, 1869, and other statutes and joint resolutions of New Jersey, being the owner of lands fronting on New York Bay, and "desirous of obtaining a lease for the lands under water hereinafter leased which lie in front of said lands," had applied to the commissioners appointed under the act of March 31, 1869, and the Governor, "for a lease of the lands hereinafter leased"; that it has applied to them "to fix the price and reasonable compensation and the annual rental for the lease of so much of said lands under water as lie below high-water mark, and may properly be included in the lease, and the boundaries and the price, reasonable compensation and the annual rental to be paid for the same"; that, in compliance with the application, the commissioners had "agreed to lease the lands hereinafter mentioned, and determined that the sum of $4,233.60 as the annual rental to be paid for said lands under water so designated, and did fix the sum of $60,480 as the price or reasonable compensation on payment of which a conveyance of all or any part of the said lands free from rent would under said act be made"; that the applicant had secured to be paid to the Treasurer of the state the above-mentioned annual rental; and that it had "applied to the said commissioners for a conveyance assuring to it, its successors and assigns, the land under water hereinafter described." After this recital, the instrument proceeds to declare that: "The said state of New Jersey, by the said commissioners, the Governor concurring, in consideration of the premises and of the rent, covenants and conditions hereinafter contained, doth hereby bargain, sell, lease, and convey unto the said the Morris & Cummings Dredging Company,

and to its successors and assigns forever," the tract of land for which "a conveyance" had been sought, which is described by metes and bounds, "and also the right, liberty, privilege and franchise to exclude the tide-water from so much of the lands above described as lie under tide-water by filling in or otherwise improving the same, and to appropriate the land above described to their exclusive private use." The instrument then declares that the grantee is "to take, to have and to hold, use, exercise and enjoy the said lands and premises, and all the rights, liberties, privileges, franchises and perquisites aforesaid, exercisable within and over, or with reference to the same, to and for the said several uses, intents and purposes, and in the manner and form that they are above granted unto the said the Morris & Cummings Dredging Company, and to its successors and assigns, forever, subject to the regulations now imposed by law on the exercise of the said rights of property hereby granted, and to such as shall hereafter lawfully be made, yielding and paying therefor unto the said state of New Jersey the annual rent of $4,233.60, to be paid to the state of New Jersey by the said the Morris & Cummings Dredging Company, its successors and assigns, in two equal half-yearly payments, one half thereof on April 30th, and the other on October 30th in each and every year forever, the first payment to be made on October 30, 1881." Then follows a covenant by the grantee on behalf of itself and its successors and assigns for the payment of the rent, a provision authorizing the state, in case any installment of rent shall not be paid when due, "into the said tract of lands hereby leased to re-enter and the same and every part thereof, and all improvements, and all the rights, liberties, privileges and franchises aforesaid, to have, possess and enjoy." Lastly follow covenants by the state that "a conveyance will be made to the Morris & Cummings Dredging Company, its successors and assigns, of the said lands, rights, privileges and franchises, or any part thereof it or they may desire, free and discharged from the whole or of an equitable portion of the said rent, on paying to the said state the sum of $60,480.00, or an equitable portion thereof, and upon application duly made therefor," and that the state "will not make or give any grant, license, power or authority to any other person or corporation affecting lands under water in front of said lands hereby leased."

This instrument must be construed in the light of the legislation by which it was authorized. That legislation, as we have seen, declared by section 4 of the act of March 31, 1869, that the commissioners are authorized to execute "a lease in perpetuity" to the grantee, his heirs and assigns, if an individual, or, if a corporation, to its successors and assigns, upon an annual rental being secured to the state, and that such lease should not merely pass the title to the lands therein described, but the right to exclude the tide water by filling in or otherwise improving the same, and to appropriate the land to exclusive private uses, and to the right to the perquisites of wharfage and other like profits, tolls, and charges. By section 8 of the same act the commissioners are authorized to "fix such price, reasonable compensation or annual rentals for so much of said lands as lie below high-water mark as are to be included in the grant or lease," and to execute "a

conveyance assuring to the grantee, his or her heirs and assigns" if an individual, or to its successors and assigns if to a corporation, the lands described in the conveyance, and delares that "such grantee may reclaim, improve and appropriate to his and their own use such lands," and that "such lands shall thereupon vest in said applicant." These provisions clearly authorize the conveyance, even though it be by what the statute calls a lease, of an inheritable estate; that is, of an estate in fee. There is nothing in the joint resolution of March 17, 1870, the act of April 6, 1871, or the act of March 27, 1874, that repeals such authority. What the state did in the present case was to convey to the Morris & Cummings Dredging Company an estate in fee simple, with reservation of an annual rent. The instrument itself shows an intent to convey such an estate. Instead of conveying the lands therein described by the technical words of a lease "demise, grant and to farm let," they are conveyed by the words "bargain, sell, lease and convey." Instead of conveying the lands to the grantee, its successors and assigns, for a term of years, they are conveyed to the grantee, its successors and assigns, forever. The habendum and tenendum clause runs to the grantee, its successors and assigns, forever.

By this instrument the state parted with the whole estate as effectually as if the consideration had been paid in one sum. The instrument contemplated two methods of paying the consideration, an annual sum equal to 7 per cent. of the entire consideration, as directed by the joint resolution of March 17, 1870, and a lump sum, at any time at the option of the purchaser, whereupon another conveyance was to be executed and the annual payments cease. The right, title, and interest of the purchaser were the same whichever method of payment was adopted. So long as the purchaser made the annual payments, the estate vested in it was as absolute as if the entire capital sum had been paid in the first instance. The use of the words "lease" and "rent" does not change the quality of the estate where the whole interest is conveyed. Substance, not form, controls. A lease never conveys all that the owner has. That at some time and by the very terms of the instrument itself the estate shall revert to the lessor, his heirs or assigns, is of the essence of a lease. In the present case a default in the annual payments causes a forfeiture; but this is not the necessary result of the terms of the conveyance. It provides for such a contingency, but does not require it. The conveyance transferred the whole estate to the purchaser. Only his disregard of the terms can end it and cause a reversion. Cook v. Mayor and Counsel and City of Bayonne et al., 77 Atl. 1048, decided by the New Jersey Supreme Court since the argument in the present case, is directly in point. It was there said:

"An instrument calling itself a 'lease' made by the riparian commission of this state for lands under water, pursuant to the statutes of 1869 and 1871 (3 Gen. St. 1895, pp. 2786, 2796), which 'bargains, sells, leases and conveys' to the grantee 'her heirs and assigns forever' with habendum in fee and reservation of annual rental with right of re-entry and of distress in case of non-payment expressly reserved, and covenanting for a further conveyance free and discharged of the rent on payment of a stipulated gross sum, is a grant in fee subject to a rent charge, and the land therein described is taxable in the hands of the grantee."

I concur in the defendants' contention that the estate conveyed is an estate in fee simple, with a condition subsequent, the condition being that, if the annual payments are not made when due, the estate may be defeated, and that the land described in the instrument made by the state of New Jersey to the complainant's grantor is taxable in his hands.

The second contention, viz., that the lands are without the jurisdiction of the state, has been decided adversely to the complainant by the United States Supreme Court in Cent. R. R. of N. J. v. Jersey City, 209 U. S. 473, 28 Sup. Ct. 592, 52 L. Ed. 896.

[2] Third. Is the land within the taxing district of Jersey City? By the tenth stipulation it is agreed that, if the lands in question became a part of Jersey City, they became so under the provisions of section 1 of the act to reorganize the local government of Jersey City, approved March 31, 1871 (P. L. [N. J.] p. 1094), sections 1 and 4 of the act of February 4, 1873 (P. L. [N. J.] p. 203), consolidating Jersey City and Greenville, and section 1 of the act of March 18, 1863 (P. L. [N. J.] p. 306), incorporating the township of Greenville. An examination of these provisions alone makes it impossible to determine the exact New York Bay front boundary of Jersey City at the time of the filing of this bill, so far as it relates to the locus in quo.

None of these gives the boundaries of the township of Greenville. Section 2 of the latter act read in connection with section 1 thereof does give such boundaries, which are as follows:

"On the southeast by New York Harbor, on the west by the Morris Canal, and lands of James Currie, Esquire; on the northwest by Newark Bay and the Hackensack River; on the northeast by a road or lane known as Myrtle Avenue, with a continued line running southeasterly from said Avenue to New York Harbor, and northwesterly from said avenue to the Hackensack River (this last boundary being the unadjusted dividing line between the 'town of Bergen' and the township hereinafter incorporated)."

As the locus in quo is admittedly in New York Harbor and contiguous to the upland formerly a part of Greenville, the question whether it is a part of the taxing district of Jersey City depends upon whether it was a part of Greenville before its consolidation with Jersey City. "On the southeast by New York Harbor" is the pertinent course. "Harbor" has a more extended meaning than "shore." By the shore of a tide-water bay is usually meant the part between ordinary high and low water marks, alternately covered and left dry by the ordinary flux and reflux of the tides. Tyler, Law of Boundaries, p. 33. A harbor is a port or haven for ships, a sheltered recess in the coast line of a sea, gulf, bay, or lake, most frequently at the mouth of a river (Cent. Dict. and Cyclo.), in which ships can moor and be sheltered from the fury of the winds and heavy seas. A finding that a harbor extends to a line inside of which large numbers of vessels may find protection from storms is correct. Rowe v. Smith, 51 Conn. 266–271, 50 Am. Rep. 16.

[3–6] The legislative intent in the use of the words employed in running a water boundary governs, rather than the literal meaning of the words. The words "to," "on," "by," "at," "along" a nontide water stream presumptively carry title as far into the stream as the grantor

possesses. "Any boundary at tide water, by whatever name—whether sea, harbor, or bay—includes the land below the high water mark, as far as the grantor owns." City of Boston v. Richardson, 13 Allen (Mass.) 146, 155. In Atty. Gen. v. Del. & Bound Brook R. R. Co., 27 N. J. Eq. 631, 639, the Court of Errors and Appeals held that no rule is more firmly settled than "that grants of land bounded upon or along rivers above tide water carry the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river." This presumption, however, does not exist where the grantor is the state, unless the intention to so convey is clear. But it must not be overlooked that on this question of legislative intent we are not considering a grant of a title to the soil under the tide water, but the ascertaining of the extent of the territorial jurisdiction of one of the municipalities created by the state, to which the state has delegated some of its sovereign powers, and upon which it has imposed the burden of exercising some of its sovereign prerogatives. The terms used by a sovereign in such grants are not to be subjected to the strict rule of construction as when it grants title to some of its territory to a private grantee. The legislative purpose sought by such territorial subdivision is to be kept in mind.

In McCannon v. Sinclair, 2 El. & El. Q. B. 53, held that where a parish comes down as far as the bank of a river, a navigable stream, there is a prima facie presumption that it extends as far as the middle of the river, and that a pier extending beyond low-water mark was subject to the poor rates. In Rex v. Landulph, 1 Moody & R. N. P. Rep. 393, held that where two parishes are separated by a river, and there is no positive evidence of the boundary line between them, it is presumed that the boundaries coincide with the middle line of the channel. Luke v. Brooklyn, 43 Barb. (N. Y.) 54, affirmed 1 Abb. Dec. (N. Y.) 24, held:

"For the purpose of ascertaining whether particular property is situated within the city of Brooklyn, the line of low water, as the water flows in the East River, after the land is reclaimed from the river, or by the erection of wharves and piers, and the filling in from the shore for the purpose, is to be deemed the dividing line between the cities of New York and Brooklyn. The jurisdiction of the city of Brooklyn must from necessity follow the shore as it advances into the river or bay, whether the accretion proceeds from alluvion or artificial deposits and erections."

Admittedly the county of Hudson, of which Jersey City is a territorial subdivision, extends to the line between New Jersey and New York, embracing the locus in quo. The language of Judge Pratt in Tebo v. Brooklyn, 10 N. Y. Supp. 749,[1] is so apt to this situation as to justify its insertion here:

"The respondent concedes that the lands under water in Gowanus Bay form a part of the county of Kings, but claim that those lands fall within no town. To quote from respondent's printed argument: 'The county of Kings includes such land under water, the line running from Red Hook Point to the

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 57 Hun, 591.

west, along the southern boundary of New York County to the centre of the main channel to the ocean, but the lands under water fall within no town.' The idea that land may be within a county and yet fall within no town is so peculiar that clear evidence would be required to satisfy us that such has been the legislative intent. We do not find such evidence. On the contrary, section 1 of the charter of 1854 [Laws N. Y. 1854, c. 384] seems to assume that the city of Brooklyn is bounded by the bay of New York, clearly implying that Gowanus Bay is included within the limits of Brooklyn."

The territory of the state extends to the middle of New York Bay or Harbor. The question of boundaries here is not between municipalities of the same sovereignty. There is nothing in the acts creating the township of Greenville out of the town of Bergen, or of the town of Bergen out of the township of Bergen or of the township of Bergen out of the county of Bergen, or of the county of Bergen, that suggest a legislative intent to exclude from such boundaries a portion of the state's territory lying between the upland and its exterior boundary lines in New York Bay. In such case the presumption is, first, that in the dividing of the state's territory into counties, all of it, for government purposes, was intended to be included; and, second, that in the subdividing of the county of Bergen the same legislative intent was carried out.

[7] The legislation of the state founded upon the constitutional mandate, enacted before the state granted the lands in question, and during the years that the taxes challenged were imposed, requires that all property not expressly exempted be taxed, and that lands be assessed to the owner thereof. Act March 17, 1854; Act March 19, 1891 (3 Gen. Stat. N. J. 1895, pp. 3345, 3350). The same requirement still obtains. Act April 8, 1903 (P. L. p. 397) §§ 5, 6. To admit the contention of complainant under this head, a class of property than which none is more valuable would escape taxation; not by express legislative exemption—the only way indicated in the cited enactments—but by a narrow construction of the word "on" in running the Harbor boundary. Such a rule of construction is not permissible in view of the state's policy, clearly indicated by legislation granting title to lands under tide water, requiring the taxation of all property within the state, and subdividing the entire territory of the state into taxing districts, to impose and collect such taxes.

The fourth ground, "that assessment was made upon real estate and not upon the interest of the complainant therein," is disposed of by the conclusion reached on the first ground.

The remaining contention is that the lien of the taxes has expired. This ground is applicable only on a finding that the lands were taxable by Jersey City. As such taxability has been found, it follows that, if any of the taxes are enforceable by sale of the land assessed, such sale cannot be restrained on this ground. The bill does not allege, and no claim is made, that complainant paid or offered to pay any of such taxes, and the answer specifically asserts that they were not paid, and the proofs do not show their payment. Section 151 of the act to reorganize the local government of Jersey City, approved March 31, 1871, declares:

"That all taxes and assessments which shall hereafter be assessed or made upon any lands, tenements or real estate situate in said city, shall be and remain a lien thereon from the time of the confirmation thereof until paid."

Counsel for complainant contends that this provision was repealed by the act of March 17, 1882 (P. L. N. J. p. 130). This act is amendatory of and supplementary to the general tax act of 1846. Query, whether this act limited in its operation to the act of 1846 which did not apply to special charter provisions (Sheridan v. Stevenson, 44 N. J. Law, 371) will impliedly repeal such special legislation of 1871 applicable to Jersey City alone, and which was not repealed by the amendments to the New Jersey Constitution inhibiting special legislation adopted in 1875. A determination whether the charter provision is repealed by this later enactment is not necessary, however, in this case. Under the tax adjustment act of March 30, 1886, known, and herein referred to, as the Martin act, and which the record shows has been invoked by the defendants to adjust unpaid taxes, some, if not all, of the taxes challenged in these proceedings, may be made the basis of a new lien. Jersey City v. Speer, 78 N. J. Law, 34, 72 Atl. 448, affirmed 76 Atl. 1037. Nor is it necessary to consider the further contention that "the lien of all of the taxes prior to 1888 has expired because of the presumption that they are paid."

[8] This presumption is not one of law, but one of fact, and therefore rebuttable. In re Martin Act Commissioners of Plainfield, 21 N. J. Law J. 334.

[9] The commissioners of adjustment to whom these alleged arrearages of taxes were submitted for adjustment had complete jurisdiction over that subject. They found such taxes were due and unpaid. Such findings in a collateral proceeding cannot be overcome by the alleged presumption of fact. Stanley v. Supervisors of Albany, 121 U. S. 535, 7 Sup. Ct. 1234, 30 L. Ed. 1000.

In these proceedings the commission will be presumed to have proceeded according to law. If in the readjustment of the taxes the commission has included in its findings, taxes for years to which such presumption could be enforced, or for years the lien for which was lost at the time the premises passed into the ownership of the complainant, and could not thereafter be legally established against his ownership in such lands, an adequate remedy at law, by appropriate proceedings in the state courts, was at his command.

[10] Municipal operations are dependent, directly or indirectly, upon moneys derived from taxes, and interference by injunction with the collection of such taxes legally imposed, upon the ground of laches, will be accorded only where the complainant's right is clear, the injury imminent, and the remedy at law inadequate for his protection.

The present case presents no sufficient ground for the injunctive or other relief prayed, and the bill is dismissed.